**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

BRANDON STILL,                                      Case No. 1:16-cv-640

       Plaintiff,                                  Dlott, J.
                                                    Bowman, M.J.

   v.

CYNTHIA DAVIS, et al.,

       Defendants.

## REPORT AND RECOMMENDATION

Plaintiff, an incarcerated individual who proceeds *pro se*, filed suit against five

individuals employed at the Southern Ohio Correctional Facility ("SOCF").    On

December 18, 2016, all Defendants jointly moved for summary judgment.   I now

recommend that Defendants' motion be granted.

### I.    Standard of Review

Federal Rule of Civil Procedure 56(a) provides that summary judgment is proper

"if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."   A dispute is "genuine" when "the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   A court must view the

evidence and draw all reasonable inferences in favor of the nonmoving party.

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).   The

moving party has the burden of showing an absence of evidence to support the non-

moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

Rule 56(c) explains in relevant part that a party asserting that a fact cannot be

genuinely disputed must support the assertion by citing to "particular parts of materials in the record, including depositions, documents…affidavits or declarations, stipulations…, admissions, interrogatory answers, or other materials" or alternatively by showing that the adverse party "cannot produce admissible evidence to support the fact." This Court must consider the cited materials, but "may" consider other materials in the record. Rule 56(c)(3).

Once the moving party has met its burden of production, the non-moving party cannot rest on his pleadings, but must present significant probative evidence in support of his complaint to defeat the motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248-49. The mere existence of a scintilla of evidence to support the non-moving party's position will be insufficient; the evidence must be sufficient for a jury to reasonably find in favor of the nonmoving party. *Id.* at 252.

Applying the relevant standards, and drawing all reasonable inferences in Plaintiff's favor, I turn now to the facts alleged by Plaintiff in this case.

## II.    Facts Reasonably Construed in Plaintiff's Favor

Plaintiff alleges that on August 6, 2015, he was placed in a disciplinary cell at SOCF that contained a "puddle" of water that he later discovered was due to a "busted sewage pipe in the Pipe Chase," an area that Plaintiff describes as an access point to the block's plumbing that is used by maintenance staff to fix any plumbing issues. (Doc. 3 at ¶¶ 11-12). He alleges that during the time he remained in the disciplinary cell, water "sprayed and leaked" through the damaged pipe into his cell whenever someone in a cell above him flushed his toilet, with water coming "through a back vent" that was located along a back wall. (*Id.* at ¶¶ 12-13).

An Informal Complaint Resolution ("ICR") attached as an exhibit to Plaintiff's complaint states that Plaintiff did not realize that the "puddle of water in the back of my cell" was growing until after he had been housed there for 24 hours. (Doc. 3 at ¶12). According to the ICR, the fact that the leaking water was contaminated with human waste became apparent to him "due to the smell *after a couple of days*." (Doc. 3 at 12, emphasis added). He alleges that he first attempted to call Defendant Davis to alert her of the puddle on August 7, 2015, when he caught a glimpse of her after she walked by his cell, but "she refused to backtrack," "ignored his plea," and continued walking. (*See* Plaintiff's Affidavit, Exh. B to Doc. 29 at 19, ¶¶5-7; Doc. 3 at ¶¶ 16-17). In his ICR, it is not clear how much Defendant Davis heard from Plaintiff, as he reports that "since she was already past my cell she refused to return and would not come back to speak to me." (Doc. 3 at 12). However, Plaintiff maintains that he spoke loudly enough for her to hear him over the range. (Doc. 29 at 19, ¶7).

In the complaint filed in this Court, but notably <u>not</u> in his Affidavit or in the ICR attached as an exhibit,[1] Plaintiff further alleges that on August 8, August 9, and August 12, he allegedly informed and/or or requested cleaning supplies from five different "John Does." (*See generally* Doc. 3, Complaint at ¶¶19, 20, 21, 28, 29). However, Plaintiff has never identified any John Does throughout the course of discovery, nor has he produced any evidence to support these particular allegations. Plaintiff's own affidavit (produced in opposition to Defendants' motion for summary judgment) contains no reference to the referenced John Does. Moreover, Plaintiff has not alleged, much less

---

[1]Plaintiff's complaint is also inconsistent in this regard (alleging that he told additional John Doe officers) with his appeal of the denial of his grievance, wherein Plaintiff states that "[m]y ICR tells everyone I informed or tried to inform to no avail." (Doc. 3 at 17).

produced any evidence, that any of the John Doe officers ever communicated any complaint to any of the five named Defendants. Thus, the "John Doe" allegations do not appear material or relevant to the issues presented.

Returning to allegations relating to the Defendants, Plaintiff alleges that, after unsuccessfully attempting to yell to Defendant Davis, he first reported the sewage water leaking into his cell to Defendant Bell on August 10, 2015, when Defendant Bell walked through the housing unit. Plaintiff alleges he asked to be moved or for cleaning supplies, to which Defendant Bell responded "I will see what I can do." (Doc. 3 at ¶¶ 22-23; Doc. 29 at 19, ¶8). On the same day, Plaintiff alleges that he informed Defendant Keating of "the situation" when Keating arrived to escort Plaintiff to the shower. Plaintiff states that he asked to be moved or to be provided cleaning supplies. Defendant Keating replied that he could do nothing about moving Plaintiff, but would "see about cleaning supplies." (Doc. 29 at 20, ¶9; Doc. 3 at ¶24). Plaintiff states that after his return from the shower, he again inquired about a BioCart with which Plaintiff could clean up the water, and Keating replied that he had not yet called for a cart because "he's been a little busy." (Doc. 29 at 20, ¶ 10). Plaintiff asked Keating not to forget about his request. Despite Keating verbally reassuring Plaintiff that he would not forget, a BioCart did not arrive during his shift. (*Id.*)

During the first shift of the next day, August 11, Defendant Stringer arrived to escort Plaintiff to the shower. At that time, Plaintiff informed Defendant Stringer of "the situation and asked to be moved or be able to clean it up." (Doc. 3 at ¶25). Defendant Stringer allegedly replied by saying "I will see what I can do" but Plaintiff still did not receive any supplies. (*Id* at ¶ 25; Doc. 29 at 20, ¶11). Upon his return from the shower,

4

Plaintiff states that he asked Defendant Stringer if he had yet requested a BioCart or made a request for Plaintiff to be moved, and Stringer responded "no," but assured Plaintiff again that he planned to look into it, though no BioCart arrived on Stringer's shift. (Doc. 29 at 20, ¶ 12).

When he saw Defendant Bell later that same day, Plaintiff reminded him of his earlier request to be moved or for cleaning supplies. (Doc. 29 at 21, ¶ 13). Plaintiff alleges: "Once again Capt. Bell said he would see what he could do but nothing was done during the shift." (*Id.* at ¶ 26).

Finally, on August 13, Plaintiff "caught a last second glimpse" of Defendant Lieutenant Eshum as he walked past Plaintiff's cell. (Doc. 29 at 21 ¶ 14). Plaintiff states that he was able to gain that Defendant's attention by calling out "white shirt," and that he then informed Eshum - through the non-defendant correctional officers who accompanied him - of the sewage water collecting in the cell and asked to be moved or for a BioCart to be called.[2] "Although Lieutenant Eshum *didn't hear everything I said*, Officer Comer relayed what I said to him and in return Lieutenant Eshum responded by saying "no" and continued his walk-thru." (*Id.* at ¶15, emphasis added). Notwithstanding Eshum's response, Plaintiff was moved the very next day to new cell, following the expiration of his disciplinary confinement.

Plaintiff complains that he was forced to live in "unsanitary" conditions during his

---

[2]In his ICR, Plaintiff mistakenly states that he spoke to a "Lt. Ison" but the correct name was identified during the appeal of Plaintiff's administrative grievance. Although Defendants briefly criticize the timing of that grievance, (Doc. 30 at 3), this Court previously denied the Defendants' motion to dismiss Plaintiff's lawsuit on grounds that the grievance and/or appeal were untimely filed. Finally, while correctly identified in this proceeding, it is apparent from Defendants' motion and discovery responses that the surname has been misspelled as "Eshum" rather than "Eshem." The Court will use the uncorrected spelling for convenience, because no party has formally moved to correct the record.

8 day stay in the disciplinary cell, and that due to a continued leak, the puddle of standing water grew to cover a third of the cell floor by the time he was moved. He stated that the standing water "gave off a repugnant ammonia and excrement smell," which "made it difficult to do everyday activities and caused me to lay up in bed under the covers to hide from the smell." (Doc. 29 at 22, ¶ 17). Additionally, Plaintiff states in his affidavit in opposition to summary judgment that the water made it "hard to access the desk, sink and toilet" without getting his shoes and clothes wet, and "caused me to suffer from headaches, a lost [sic] of appetite at times, and would cause me to gag while eating." (Doc. 29 at 22 ¶ 18; *see also* Doc. 3 at ¶33).[3] He further avers that the lack of cleaning supplies for 8 days violated SOCF policy, which allows inmates to clean their cells once per week. (*Id.* at 22). In his complaint he alleges that he was exposed to a general "risk of slipping and falling and possibly contract[ing] a disease through contact with standing water." (*Id.* at ¶34). There is no evidence that Plaintiff actually slipped, fell, or suffered any other serious health effects.

Because inmates must exhaust their administrative remedies before they may file a federal lawsuit, Plaintiff filed an initial grievance on August 14, 2015; an official responded that he would address the issue with the unit manager and maintenance. Dissatisfied, Plaintiff filed an administrative appeal (Notice of Grievance). In a response

---

[3]The allegations regarding the difficulty of access to the desk, sink and toilet appear only in Plaintiff's affidavit, which affidavit also references the fact that Plaintiff was offered frequent, if not daily, showers. In contrast to his affidavit, Plaintiff does not allege anywhere else, including in his informal grievance or related appeals, that the offensive water actually touched his skin or his clothing. Instead, he previously states only that he was unable to use his desk and found it "hard to have access to my toilet and sink." (Doc. 3 at 17). The undersigned notes that the phrasing of the affidavit, while implying that the water actually did come into contact with his shoes, socks and the hem of his pants, still says only that it was "hard to access" his desk, sink and toilet without the (potential for) the water coming into contact with his clothing.

dated October 5, 2015, Inspector Mahlman denied that appeal, stating that she had spoken to Defendant Eshum and other officers, including Officer Upton and the Health and Safety Officer, and that no one recalled any issue with the cell having a problem with a broken pipe or leaking sewage, or Plaintiff contacting them to complain, such that she was "unable to substantiate your allegations." (Doc. 3 at 16). Plaintiff filed a final appeal to the Chief Inspector, in which he alleged that staff had failed to inspect the cell and discover the puddle prior to housing him in it. Plaintiff alleges that if the staff had inspected the cell, they "would ha[ve] seen the puddle and had someone clean it up…." (Doc. 3 at 17).

Plaintiff alleges that the five Defendants exhibited "deliberate indifference to Plaintiff Still's health and safety," and violated his Eighth Amendment rights by causing him pain and suffering. (Doc. 3 at ¶ 39). He seeks declaratory, monetary, and injunctive relief.

Defendants filed the instant motion for summary judgment on October 30, 2017. After obtaining an extension of time, Plaintiff filed a response on December 21, 2017,[4] to which Defendants filed a reply.

### III. Defendants Are Entitled To Judgment Under Prevailing Eighth Amendment Standards

Plaintiff's complaint alleges that all Defendants were "deliberately indifferent" to his "health and safety" and/or that his conditions of confinement caused him

---

[4]Although Defendants object to the filing of the response as untimely because the Court granted Plaintiff an extension only through December 18, the undersigned finds good cause to consider the response as if timely filed. Plaintiff's certificate of service indicates that he placed the response in the prison mail system on December 16, 2017, two days prior to the specified deadline.

unnecessary "pain and suffering."  (Doc. 3 at 9, ¶ 39).  Plaintiff's claim arises under the Eighth Amendment.

> The Constitution "does not mandate comfortable prisons," *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981), but neither does it permit inhumane ones, and it is now settled that "the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."

*Farmer v. Brennan*, 114 S.Ct. 1970, 1976, 511 U.S. 825, 832 (1994)(quoting *Helling v. McKinney*, 509 U.S. 25, 31, 113 S. Ct. 2475, 2480 (1993)).  In order to prove that the five identified Defendants exhibited deliberate indifference in violation of Eighth Amendment standards, Plaintiff must produce evidence to support both an objective component of his claim, and a subjective component.  Based on the record presented, and even construing all reasonable inferences in Plaintiff's favor, the Defendants are entitled to judgment as a matter of law because no reasonable fact-finder could find for Plaintiff on either component of his claim.

### A.  Objective Component

In order to prove the objective element, Plaintiff must demonstrate that the harm to which he was subjected was "objectively, sufficiently serious," such "a prison official's act or omission must result in the denial of 'the minimal civilized measure of life's necessities,'" *Farmer v. Brennan*, 114 S.Ct. at 1977 (quoting *Rhodes*, *supra*, 452 U.S. at 347, additional internal quotation marks and citations omitted).  Put another way, for a claim "based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm."  *Id.* at 834, citing *Helling*, *supra*, 509 U.S. at 35.

Citing institutional records beginning four days prior to Plaintiff being moved to the cell and continuing through January 15, 2016, Defendants first argue that there is no evidence that there was ever any leak of sewage water through the pipe chase into the cell, other than Plaintiff's statements in his administrative grievance. Plaintiff's ICR was denied because his allegations could not be substantiated. (Doc. 29 at 15-16; Doc. 3 at 16). Defendants have produced security check and sanitation inspections, dated for August 2, 2015 through August 8, 2015 and August 9, 2015 through August 15, 2015, Daily Shift Rosters dated August 6-15, 2015, Plaintiff's August 14, 2015 ICR and appeals of that grievance, the August 2015 weekly fire/safety sanitation inspection reports, the August 2015 monthly fire/safety/sanitation report, and the Declaration of Chris Abell, who was the Maintenance Supervisor at SOCF.   In addition to documentation indicating that no leak was observed and no repair was made (per institutional records), Mr. Abell states in his affidavit that if toilet water had been leaking from the toilet above Plaintiff's cell, the institutional plumbing was such that both toilets would have been rendered inoperable.   It is undisputed that Plaintiff did not complain that his toilet was inoperable.   Therefore, Defendants argue that there is no genuine issue of material fact that no leak (or subsequent repair of any leak) ever occurred.

However, Plaintiff persuasively points to his August 14, 2015 ICR, in which he first complained about the existence of a leak and that he was not moved or provided appropriate cleaning supplies.  Plaintiff also has offered as an exhibit to his response his own affidavit, in which he states that he spoke to Defendants Bell, Eshum, Keeting and Stringer "face to face and informed them of the sewage leak from the damaged pipe," and that three of them observed the puddle of standing water in his cell.  Plaintiff

9

admits that he did not speak directly with Defendant Davis, but avers that he yelled loud enough that she should have heard him. (Doc. 29 at 19, ¶¶ 5-7). Plaintiff's ICR and affidavit are sufficient to create a genuine issue of fact as to whether a puddle of standing water existed during the 8 days in which he was confined in the cell. *Accord Krutko v. Franklin County, Ohio*, Case No. 2:11-cv-610, 2014 WL 6687143 (S.D. Ohio Nov. 26, 2014)(Marbley, J.) (denying summary judgment to six individual defendants when presented with a similar conflict between institutional records and the plaintiff's affidavit).

Nevertheless, Defendants remain entitled to summary judgment because, even assuming that a reasonable fact-finder might determine that the puddle existed, Plaintiff cannot show that condition presented an "objectively, sufficiently serious" risk during the 8 days he was confined to the cell, or "a substantial risk of serious harm." *Farmer*, 511 U.S. at 834.[5] Plaintiff describes a puddle of water that started out small, but that due to a damaged pipe, grew larger over the following week until the water impacted (at most) one third of his cell floor. The fact that the puddle was small at its outset is evident from Plaintiff's complaint and original grievance, in which he describes discovering only after 24 hours that "a puddle of water in the back of my cell" was "starting to get bigger." (Doc. 29 at 12). Plaintiff alleges that the source of the leak was a pipe chase – a central pipe used by maintenance to access the plumbing system for the entire block.

---

[5]The undersigned acknowledges that Defendants' chiefly rely on the argument that Plaintiff has failed to prove the objective component of his claim based on a lack of evidence of a leak – an argument that is not persuasive on the record presented. Although the Defendants' argument concerning the lack of proof of the objective component of Plaintiff's claim is limited, the undersigned finds it to be sufficient to address the argument on the alternative legal and factual grounds stated, both because Plaintiff himself has cited most of the relevant cases, and because Plaintiff may further respond through objections to this R&R if he so chooses.

Presumably because the water was diluted by the normal water flow and not comprised solely of human waste, Plaintiff did not infer the origins of the puddle until "after a couple of days" based on the smell.  (Doc. 29, ICR at 12).  However over time, Plaintiff avers that the malodorous puddle "made it difficult to do everyday activities and caused me to lay up in bed under the covers to hide from the smell."  (Doc. 29 at 22, ¶ 17).

Conditions-of-confinement cases are highly fact-specific. "In general, the severity and duration of deprivations are inversely proportional, so that minor deprivations suffered for short periods would not rise to an Eighth Amendment violation, while 'substantial deprivations of shelter, food, drinking water, and sanitation' may meet the standard despite a shorter duration." *DeSpain v. Uphoff*, 264 F.3d 965, 974 (10th Cir. 2001)(internal citation omitted).  Claims alleging unsanitary conditions due to clogged toilets and leaky plumbing are relatively common in the prison system.  In many cases, inmates deliberately cause flooding of toilets, either as a means of protest, or because they are mentally ill.  In other cases, some form of accidental leak has caused the problem, as is alleged here.

Colloquially speaking, the "yuck" factor influences the assessment of the severity of the deprivation to sanitation and level of risk to health and safety. Thus, cases involving excrement or feces, or raw sewage from toilet overflows, tend to evoke greater concern than cases like the one presented, involving leaky pipes that result in a lesser degree of non-potable or contaminated water. In assessing the risk of serious harm, courts take a common sense approach.  A condition that might not offend the Eighth Amendment over a shorter period of time could violate the Eighth Amendment if the inmate was subjected to the condition over a long period.

On similar facts involving leaks of unsanitary water from damaged pipes, courts have held that even fairly long exposure will not satisfy the objective component of the Eighth Amendment in the absence of any physical harm. *See e.g. Keel v. Davidson County Sheriff's Office*, 2015 WL 799724 *3 (M.D. Tenn. Feb. 25, 2015)("Multiple courts have found that exposure to leaking sewage in a prison cell with no accompanying physical harm is insufficient to satisfy the objective component of a constitutional violation," collecting cases and granting summary judgment to defendants where inmate complained of sewage leak above his cell for 3 weeks before a work order was placed, but alleged no physical harm); *Antonelli v. Walters*, 2009 WL 921103 at *20 (E.D. Ky. March 31, 2009)(claim of leak and raw sewage in cell resulting from failure to maintain pipe chase failed to state Eighth Amendment violation in the absence of allegation of physical harm); *Smith v. Melvin*, 94 F.3d 647 (7th Cir. Aug. 14, 1996)(inmate failed to allege constitutional deprivation from leaky toilet and accumulating water on the floor, where inmate did not allege how much standing water accumulated, how long he lived in cell, or how extensive the damage, if any, to his personal belongings, nor did he allege that toilet actually overflowed or flooded cell with raw sewage). *Contrast Frazier v. George*, 2014 WL 4979315 at *12 (M.D. Tenn., Oct. 6, 2014)(exposure to raw sewage on a daily basis for three months, including both urine and feces, created a genuine issue of fact even though "[g]enerally, the mere presence of raw sewage, without an accompanying physical injury, does not constitute a violation of a prisoner's Eighth Amendment rights.").

In contrast to the leaky pipe cases, the cases cited by Plaintiff in opposition to summary judgment are clearly distinguishable because they involve far more severe

deprivations to sanitation, greater and clearer risks to health and safety, and/or more prolonged deprivations. For example in *Krutko*, a jailed inmate testified that he was sleeping on a cell floor when a toilet overflowed profusely, such that "raw sewage covered and soaked his clothes and body" from head to toe. *Id.*, 2014 WL 6687143 at *3. Mr. Krutko also alleged that the six defendant guards had cursed, laughed and insulted him, refused to release him from the cell for 25 minutes, and deliberately left him covered in excrement. After he vomited, the defendants transferred him to a medical cell but continued to deny him any personal hygiene items with which to clean himself, and allegedly refused multiple requests for access to basic hygiene including soap, water, a toothbrush, or a shower for five or six days. The plaintiff developed scratches and scabs as a result of trying to remove the raw sewage from his body. *Id.* at *5.[6] The court distinguished cases in which less offensive conditions did not satisfy the objective component of the Eighth Amendment, holding that "because of the degree of filth Plaintiff [allegedly] endured, and the fact that the filth festered [on his body] for several days, the conditions of Plaintiff's confinement were sufficiently serious and resulted in the denial of the minimal civilized measures of life's necessities." *Id.* at *5.

Similarly distinguishable is the Tenth Circuit case cited by Plaintiff,[7] *DeSpain v, Uphoff*, *supra*. That case involved no small leak from a pipe chase, but massive flooding including raw sewage and standing water four inches deep after inmates clogged toilets in an entire cell block during a riot. Toilets were inoperable and requests to clean the area were denied. Other inmates urinated through the bars of their cells into

---

[6]Plaintiff also claimed to have required psychological treatment due to post-traumatic stress from the incident.

[7]Nearly all of the published case law on which Plaintiff relies is from outside the Sixth Circuit.

the standing water, which contained floating feces. A food cart with a ground clearance that was "roughly the same as the water depth, making it difficult to avoid contact between the food and the contaminated water" was rolled through the area. *Id.* at 972. Mr. DeSpain was unable to eat at all. Food trays were not picked up, and the uneaten and partially eaten food was added to the standing water. Plaintiff DeSpain spent several days confined to his bed which was "the only dry area" in his cell, and required psychological treatment with anti-anxiety medication for months later. *Id.* at 973 (emphasis added). *See also, e.g., Fruit v. Norris*, 905 F.2d 1147 (8th Cir. 1990)(holding that inmates who refused order to clean out underground wet-well portion of raw sewage lift-pump station in 125 degree heat, without protective gear, stated prima face case sufficient to avoid dismissal of Eighth Amendment claim, where expert testified to dangers of heatstroke, explosive gases due to decomposing waste, as well as smaller risk of disease from contact with raw sewage).

Although the instant case does not involve the level of exposure to raw sewage the plaintiffs were exposed to in *Krutko* and *DeSpain,* it is worth noting that even in similar cases involving exposure to raw feces, courts have found no violation of the Eighth Amendment if the duration is short, and no injury occurred. The portion of the cell that is impacted also is relevant in assessing the degree of filth or "severity" of the condition. Thus, a case in which feces covered only the cell door, and the time period was limited to 48 hours, was insufficient to state a claim under the Eighth Amendment, whereas confinement in cells with multiple feces-covered walls for longer periods could state a claim. *Compare Gofarth v. Sumner County*, 2013 WL 1943020 at *3 (M.D. Tenn. May 9, 2013)(confinement in cell with door covered with feces failed to state

14

claim under 8th Amendment where no injury occurred) with *McBride v. Deer*, 240 F.3d 1287 (10th Cir. 2001)(Eighth Amendment violation could be stated based upon confinement to a cell covered by feces for three days); *see also Johnson v. Pelker,* 891 F.2d 136 (7th Cir. 1989)(wet bedding and clothing, while disquieting and not condoned, did not approach unconstitutional proportions, but placing prisoner in cell for three days with no running water, with feces smeared on the walls, while defendants ignored requests for water to be turned on or for cleaning supplies, required further review); *McCord v. Maggio*, 927 F.2d 844 (5th Cir. 1991)(Eighth Amendment violation shown where prisoner was forced repeatedly to live 23 hours per day over two year period with no bunk, but only a bare, wet mattress placed on a floor covered in filthy water contaminated with human waste, in a roach-infested, windowless, dark and unlighted cell with only a small hole cut in steel door for outside access).[8]

Although Plaintiff here complains of exposure to contaminated water in his cell over 8 days, the puddle was confined to the back of the cell at the outset.  Unlike in many cases, Plaintiff was not denied basic hygiene or access to running water.  He also never alleges that the contaminated water ever touched his skin - quite unlike the degree of filth that the plaintiff in *Krutko* alleged he was forced to endure.[9]  Plaintiff alleges that he feared slipping and falling, but there is no evidence that he could not avoid contact with the puddle, and slip-and-fall cases do not present Eighth Amendment concerns.  *See generally, Lamb v. Howe*, 677 Fed. Appx. 204 (6th Cir. 2017)(upholding

---

[8]In *McCord*, the prisoner-plaintiff was incarcerated for approximately two years in cells where he was often if not continually subjected to "harsh and occasionally disgusting" conditions, and  prison officials did not deny the substance of his allegations The defendant admitted the placement of mattresses on the floor over a 10-month period.  *Id.,* 927 F.3d at 846.

[9]The defendants in *Krutko* prevailed at trial, when a jury found in their favor and against the plaintiff on all counts.

dismissal for failure to state a claim, when prisoner alleged that he was denied a mop with which to clean up a cell flooded with several inches of toilet water by neighboring inmates who intentionally flooded their cell, and that he slipped and fell causing head injury that required stitches). Assuming that a jury would find that a leak caused the puddle to grow, the partially wet floor and offensive odor that Plaintiff describes does not rise to the level of an objectively "severe or prolonged" condition that violates the Eighth Amendment. *Accord Dellis v. Corr. Corp. of Am.*, 257 F.3d 508, 511 (6th Cir. 2001)(dismissing for failure to state a claim a prisoner's complaint alleging unconstitutional conditions of confinement where the prisoner was temporarily deprived of a working toilet and was subjected to a flooded cell); *see also generally*, *Smith v. Copeland*, 87 F.3d 265, 269 (8th Cir. 1996)(no Eighth Amendment violation where an inmate complained that he was exposed to raw sewage from an overflowed toilet in his cell for four days, but suffered no physical harm); *Bey v. Luoma*, 2009 WL 884630, at *2-3 (W.D. Mich. Mar. 30, 2009)(holding, where plaintiff alleged that he was exposed to human waste fumes for approximately six months causing sickness, migraine headaches, nosebleeds, and lack of appetite, that defendants' conduct did not violate the Eighth Amendment); *Williams v. Luetzow*, 2006 WL 1627468 at *5-6 (W.D. Mich. Jun. 9, 2006) (no Eighth Amendment violation was stated where inmate was housed with mentally ill inmates who created unsanitary conditions by smearing excrement on walls and doors, with puddle of urine on the floor, and threw urine and feces at other inmates).

Even construing all facts in Plaintiff's favor, the growing puddle of contaminated water covered a relatively small portion of his cell, and was alleged to emanate from a

damaged central pipe chase, not directly from an overflowing toilet. Other than claiming that he yelled to Defendant Davis, who did not give any indication of hearing him, Plaintiff first notified one of the Defendants of the puddle on August 10 – four days prior to his transfer to a new cell. He does not allege in his complaint or ICR that the offensive water ever so much as touched his clothing or skin, or that he was unable to avoid contact, or that he was denied the means to clean off any incidental contact. *See Dyer v. Hadwick*, 2011 WL 4036681 at *10 (E.D. Mich. Aug. 1, 2011) (noting that plaintiff's potential ability to avoid exposure and failure to allege any physical illness failed to state any Eighth Amendment violation); *Mills v. C.C.A.*, 2010 WL 5155478, at *5 (M.D. Tenn. Dec. 14, 2010) (Even if the Court takes as true the allegations that [unsanitary] water flowed from a nearby shower in the Plaintiff's cell three times a week for several weeks, these facts simply do not show that he was subjected to the type of extreme deprivation necessary to implicate the Eighth Amendment.").

In his complaint, he alleges that he was effectively unable to use his desk and found it "hard to have access to my toilet and sink," (Doc. 3 at ¶17), suggesting he may have had to step over the puddle, but that access was not impossible. It is true that his affidavit in opposition to summary judgment implies contact with the contaminated water, but that statement remains ambiguous and cannot not be fully credited. Plaintiff avers that the water made it "<u>hard to access</u> the desk, sink and toilet without saturating my shoes, socks, and the bottom of my pants legs. It also caused me to suffer from headaches, a lost [sic] of appetite at times, and would cause me to gag while eating." (Doc. 29 at 22 ¶ 18 (emphasis added); *see also* Doc. 3 at ¶33). However, the same affidavit references daily showers, (Doc. 29 at 20, ¶¶9, 10, 11, 12), and Plaintiff does

not claim that he was denied access to personal hygiene or that he asked for clean clothes and was refused, such that he would have been able to clean himself if in fact any portion of his clothing or skin had come into physical contact with the water. Considering that at the end of 8 days, the offensive water did not impact more than one third of the cell floor, any construed assertion in the affidavit that the puddle had grown deep enough to soak his shoes, socks, and bottom of his pants legs is so wholly incredible that it need not be accepted. Unless the cell floor contained a moat, the laws of physics would not have permitted containment of such deep water to such a small portion of the cell. Still, for purposes of the summary judgment motion, the undersigned finds that a reasonable jury could find that at the end of 8 days, one third of the floor was dampened or made wet by a growing puddle of smelly, unsanitary water.

The referenced puddle of unsanitary water is not a condition that any court would condone. However, at least two thirds of the cell floor remained dry, and Plaintiff's main complaint is the odor to which he was subjected, an odor that by his own admission he did not observe until after a couple of days. Drawing reasonable inferences in Plaintiff's favor, the smell grew increasingly foul and eventually diminished his appetite, causing him to "gag while eating" at times and/or contribute to occasional headaches (which were not severe enough to require medical attention).[10] (Doc. 29 at 22, ¶ 18). As unpleasant and distasteful as the cell conditions may have been, they were not so inhumane or intolerable as to violate the objective standards of the Eighth Amendment

---

[10]Plaintiff does not allege that he vomited, or reported nausea or headache, or requested any form of medical treatment from anyone, much less any of the Defendants.

as a matter of law, in the absence of any evidence of serious risk to health or safety or physical injury.

### B. Subjective Component

In addition to proving the objective component of his claim, Plaintiff must prove a subjective component by showing that each Defendant subjectively perceived facts from which he or she inferred a substantial risk existed to Plaintiff of serious harm, actually drew that inference, and then disregarded the risk. *See Krutko v. Franklin County, Ohio*, 559 Fed. Appx. 509, 511 (6th Cir. 2014)(remanding to district court to conduct an individualized inquiry to determine whether any of the defendants were entitled to qualified immunity based upon the evidence presented as to the defendants' subjective state of mind). Proof of the subjective component as to each Defendant is required, as the Supreme Court has long rejected "a reading of the Eighth Amendment that would allow liability to be imposed on prison officials solely because of the presence of objectively inhumane prison conditions." *Farmer v. Brennan*, 114 S.Ct. at 1979 (quoting *Wilson v. Seiter*, 501 U.S. 294, 299-300, 111 S. Ct. 2321, 2324-2326 (1991)).

On the record presented, the lack of evidence to support the subjective element of Plaintiff's claim against any Defendant is even more striking than the lack of proof of an objectively serious risk of harm. Plaintiff has produced no evidence at all to suggest that Defendants were aware of any serious health or safety concern, even assuming that Plaintiff's affidavit is sufficient to establish that he spoke to (or yelled at) each Defendant over the course of several days and requested a cell change and/or cleaning

supplies.[11] Notably, Plaintiff does not allege that he ever complained of any headache or other health impact, or that he expressed any health concern to any Defendant. Instead, he alleges *only* that he complained about a puddle of standing water that he believed to be toilet waste based upon the odor and location of the perceived leak. Unlike in *Krutko* where the plaintiff alleged that the defendants cursed, laughed, and insulted him, Plaintiff here alleges that three of the five Defendants responded positively and stated that they would attempt to provide him with cleaning supplies. Construing all facts in Plaintiff's favor, he has shown – at most – that some of the Defendants were negligent because after listening to his complaint and stating that they would respond, they failed to timely return with the requested cleaning supplies during their shifts.

More specifically, although Plaintiff complains that Defendant Davis "ignored" him and did not return when he called after her on the second day he was housed in the cell, there is no indication that she heard him. Ms. Davis states that she has no recollection of visiting the cell block that day, or of speaking with Plaintiff. (Doc. 25-2 at 1). Plaintiff's affidavit states only that he "attempted to call Ms. Davis back to my cell to inform her of the damaged pipe and sewage water collecting," but that she "continued with her walk thru," which is equally consistent with the Defendant not hearing him as it is with Plaintiff's interpretation that she ignored his "yelling" about his "plight." (Doc. 29 at 19, ¶¶6, 7). Even if Ms. Davis heard Plaintiff yelling about the puddle on Day 2 of his confinement in the cell, Plaintiff admits he had just realized that the puddle "was starting

---

[11]None of the five Defendants recalls speaking with Plaintiff at any time during the week of August 6-14, 2015, nor do any of the Defendants recall Plaintiff informing them of the existence of a sewage leak or standing water in J2-15. All five Defendants deny being aware of any such issue during the time period of August 6-14, 2015. *See* Doc. 25-2, Exhibit B, Interrogatory Responses.

to get bigger" such that Ms. Davis cannot be held liable for subjectively exposing him to a substantial risk of serious harm.

Plaintiff alleges that he first notified Defendant Bell on August 10, four days prior to being moved from the cell on August 14. Bell responded by stating that he would "see what I can do" but failed to return with cleaning supplies during his shift. The next day on August 11, Plaintiff avers that he saw Bell again and reminded him of problem, asking that he be moved to another cell or cleaning supplies be brought in. Defendant Bell again responded positively by saying he would look into having something done, but nothing further occurred that day. Plaintiff asserts similar facts against Defendant Keating, that on August 10 he asked to be moved or for a BioCart and that Keating replied that he could not move Plaintiff, but "would see about the cleaning supplies." (Doc. 29 at 20, ¶9). After Keating returned to escort Plaintiff back from his shower, Plaintiff asked if he had yet called for the cleaning cart, whereupon Keating replied "not yet, he's been a little busy," but assured Plaintiff he would not forget. (*Id.* at ¶10). On August 11, Plaintiff states he had a similar interaction with Defendant Stringer, wherein Stringer replied by stating he would see what he could do, and that when Plaintiff followed up with him a short time later (when Plaintiff was done showering), Stringer responded that he had not yet looked into the matter but assured Plaintiff he planned to do so. (Doc. 29 at 20, ¶¶ 11-12).

In interrogatory responses, Bell and Keating flatly deny that Plaintiff ever informed them at any time of any standing water or leak on August 10 or August 11 (Doc. 25-2 at 6, 16-17). Stringer, by contrast, does not deny the conversation but instead states that he has no recollection of any conversation, nor any knowledge of a

21

leak from the pipe chase. (Doc. 25-2 at 20). However, even assuming the truth of Plaintiff's assertions, all three Defendants verbally indicated their intention to assist Plaintiff in obtaining cleaning supplies. The fact that no supplies were forthcoming during the referenced shifts reflects - at most - inattention and negligence, not deliberate indifference or wanton indifference to a serious risk of harm.

The only Defendant who allegedly told Plaintiff "no" was Defendant Eshum, who Plaintiff acknowledges stopped after being called to while walking down the range during the second shift of August 13, 2015, accompanied by other officers, and who "didn't hear everything I said." (Doc. 29 at 21, ¶15). Yet, there is no dispute that Plaintiff was moved less than 24 hours later, on August 14, 2015.

Based on the facts alleged, all five Defendants are entitled to summary judgment because none exhibited conduct that is sufficient to satisfy the subjective component of Plaintiff's Eighth Amendment claim.

### C. Defendants Are Entitled To Qualified Immunity

For similar reasons, the undersigned finds that all Defendants are entitled to qualified immunity. Plaintiff has not demonstrated either a constitutional violation or that any Defendant acted in a manner that was "objectively unreasonable" in light of clearly established law. *Ratcliff v. Moore*, 614 F. Supp.2d 880, 890 (S.D. Ohio 2009). Although case law generally supports an inmate's right to be housed in conditions that do not violate the Eighth Amendment, for the reasons discussed, the facts alleged (a leaky pipe that caused a wastewater puddle to spread over a third of Plaintiff's cell over an 8 day period) did not clearly violate the Eighth Amendment. *See also generally Ruiz-Bueno III v. Scott*, 639 Fed. Appx. 354 (6th Cir. Feb. 2, 2016). To violate the Eighth

Amendment, the condition complained of must be sufficiently serious to warrant constitutional protection, meaning that there is a non-theoretical risk to the inmate's health and safety. Based on the lack of any controlling Supreme Court or Sixth Circuit case establishing an Eighth Amendment violation on any similar facts, a reasonable officer would not have known that a failure to immediately provide cleaning supplies or to move Plaintiff after he complained of a slow-growing puddle of contaminated water violated any clearly established constitutional right.

## IV.     Conclusion and Recommendation

Accordingly, and for the reasons stated **IT IS RECOMMENDED THAT** Defendants' motion for summary judgment (Doc. 25) be **GRANTED** and that this case be dismissed from the active docket and closed.


*s/ Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

BRANDON STILL,                                    Case No. 1:16-cv-640

       Plaintiff,                                 Dlott, J.
                                                  Bowman, M.J.

   v.

CYNTHIA DAVIS, et al.,

       Defendants.


**NOTICE**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **FOURTEEN (14) DAYS** after being served with a copy thereof. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).